239 So.2d 669 (1970)
Leslie T. HEPLER
v.
FIREMAN'S FUND INSURANCE CO. et al.
No. 8044.
Court of Appeal of Louisiana, First Circuit.
June 30, 1970.
*670 John V. Parker, of Sanders, Miller, Downing & Kean, Baton Rouge, for appellant.
Stephen P. Dart, of Kilborne, Dart & Jackson, St. Francisville, Charles W. Franklin, of Franklin, Moore, Beychok & Cooper, Baton Rouge, Dart & Dart, New Orleans, for appellees.
Before LOTTINGER, BLANCHE and PICKETT, JJ.
LOTTINGER, Judge.
Petitioner, Leslie T. Hepler, filed this suit against Scharff & Jones, Inc., hereafter referred to as "Scharff", as defendant, seeking to recover the value of certain revenue bonds which petitioner allegedly purchased through defendant. National Surety Corporation, hereafter referred to as "National", the bonding company of said defendant, was joined as a party defendant, however, was released on a motion for summary judgment filed by National. National was then brought back into the law suit as a third party defendant upon third party pleadings filed by Scharff. Following trial on the merits, the Lower Court rendered a judgment in favor of Scharff, dismissing the petitioner's suit, and further rendered judgment in favor of National dismissing the third party claim of Scharff. Scharff appealed from the portion of the judgment dismissing their third party pleading against National and petitioner appealed on its main demand.
Scharff has filed a motion to dismiss the devolutive appeal of petitioner claiming that said appeal was not timely taken. The record discloses that the judgment in this matter was rendered by the Lower Court on March 14, 1969, after taking the matter under advisement, and was read and signed on March 21, 1969. An appeal, as to the third party pleading, was taken by Scharff on June 24, 1969, with regard to the part of judgment below which rejected attorney fees. The appeal by petitioner was filed in the Lower Court on June 27, 1969. It is contended by Scharff that the appeal was not taken by petitioner within 90 days of the expiration of the delay for applying for a new trial as provided by Article 1974, and 2087 of the Louisiana Code of Civil Procedure.
Article 1974 provides that the delay for applying for a new trial shall be three days, exclusive of legal holidays, except when notice of judgment is required under the provisions of Article 1913, in which event the delay for applying for a new trial commences to run on the day after the Clerk has mailed, or the Sheriff has served, the notice of judgment as required by Article 1913. Article 1913 provides that when a cause has been taken under advisement by the Court, notice of the signing of the final judgment therein shall be mailed by the Clerk of Court of the Parish where the case was tried to the counsel of record for each party, and to each party not represented by counsel.
In opposition to the motion to dismiss his appeal, petitioner contends, and correctly so, that no certificate by the Clerk of Court certifying that the notice of judgment was mailed to counsel for any of these parties.
In Bielkiewicz v. Insurance Company of North America, La.App., 201 So.2d 130, where there was no clerk's certificate of the date of mailing of notice of judgment, the Court refused to dismiss an appeal, stating:
"By LSA-CCP Art. 1913, as amended in 1961 * * * the district clerk is under a mandatory duty to file a certificate showing the date of mailing of the judgment *671 and to whom. The evident purpose of this provision is to avoid uncertainty as to the extinction of favored rights of appeal and to prevent disputes such as the present. In the absence of such a certificate, doubts should be resolved in favor of the right to appeal."
Thus, under the clear wording of the Louisiana Code of Civil Procedure and the jurisprudence decided thereunder, we hold that the appeal taken by petitioner was timely filed, and the motion to dismiss the appeal is denied.
With regard to the main demand by petitioner, and the third party demand by defendant, Scharff, the Lower Court in its very excellent reasons for judgment, said: "This action was brought on February 27, 1967, by the plaintiff, Leslie T. Hepler, and against the defendants, National Surety Corporation (erroneously sued as Fireman's Fund Insurance Company) and Scharff & Jones, Inc. The plaintiff seeks to recover the value of certain revenue bonds which he purchased at various times beginning October 1, 1961, and ending December 3, 1962. Scharff & Jones are dealers and underwriters for municipal bonds. National Surety Corporation (hereinafter referred to as `National') issued to Scharff & Jones a `Brokers Blanket Bond' providing coverage for various and sundry losses. (See Exhibit Scharff & Jones1.)
On April 17, 1967, the Court refused to sustain exceptions of no cause of action and no right of action filed against the main demand by the defendant, Scharff & Jones. The exception of no cause of action was referred to the merits and the exception of no right of action was pretermitted.
On May 1, 1967, the Court granted a motion for a summary judgment filed by National against the demands of the plaintiff thereby dismissing plaintiff's petition as to National. The Court concluded that the coverage afforded by the `Brokers Blanket Bond' did not extend to the plaintiff a direct right of action, that the sole obligee of the bond was Scharff & Jones. National, however, remains in the litigation by virtue of the fact that it was made a third party defendant by Scharff & Jones. Scharff & Jones takes the position that the alleged loss of the plaintiff, if established, constitutes a `valid and collectible loss' under the terms of the bond and, therefore, should the Court find that plaintiff is entitled to a judgment against Scharff & Jones, the latter is entitled to a judgment over in a similar amount against National. Further, Scharff & Jones contend that irrespective of whether the plaintiff prevails in the principal demand, it is, under the terms of the bond, entitled to recover from National all expenses and attorney fees incurred by it in defense of the instant litigation as well as in defense of a suit pending in federal court between the parties which seeks a declaratory judgment interpreting the coverage afforded by the bond.
Following the filing of the third party demand by Sharff & Jones against National, as aforesaid, the latter filed another motion for a summary judgment this time leveled against the third party demand. In essence, National contended `that the loss suffered by Mr. Hepler was a "trading loss" excluded from the fidelity coverage'. The Court, on October 23, 1967, denied this motion because it felt that the question of whether plaintiff's loss was indeed a `trading loss' was one embodying a genuine issue of material fact that could be decided only after hearing all the evidence.
Relative to that part of Scharff & Jones' third party demand dealing with the right to recover expenses and attorney fees incurred in defense of litigation, it was stipulated that Scharff & Jones notified National of plaintiff's claim both before and after he filed suit, that National was called upon to defend the suit and it refused to do so. Further, it was stipulated that the issue of attorney fees and the amount thereof would be pretermitted. *672 The thrust of plaintiff's case is that Scharff & Jones, as brokers, through extensive advertising (See Exhibits P-1, P-2, P-3, P-4, P-5, P-7, P-8, P-9, P-10, P-11, P-38 and D-32.) led him to believe that investment in municipal bonds was desirable and safe; that he could rely on their superior knowledge and advice as to particular securities; that they, as brokers, offered only those bonds which had been thoroughly investigated, were properly secured, and issued by financially sound agencies; that their agent in Baton Rouge, Mr. Roy F. Blondeau, was reliable, trustworthy, thoroughly trained and for all intents and purposes was Scharff & Jones in Baton Rouge; that because of the aforesaid factors and upon the specific recommendation of Mr. Blondeau, he purchased the bonds in question believing that he was dealing with and purchasing them from Scharff & Jones and that they were general obligation bonds issued by local government agencies secured by ad valorem taxes; that in truth and in fact the bonds in question are speculative revenue bonds or marginal securities, not adequately secured, are of the type which Scharff & Jones has refused to deal in or offer to the public, and were sold to him not by Scharff & Jones but by Roy F. Blondeau, individually; that he, himself, had very little knowledge or experience as regards securities and, therefore, he advised Mr. Blondeau that he would and did rely entirely upon the advice of Mr. Blondeau; that the bonds in question defaulted and as a result thereof he has sustained a loss of $25,264.70; that because of its actions in clothing Mr. Blondeau with apparent authority, Scharff & Jones is estopped to deny that Blondeau was acting for and on its behalf; and, lastly, that Scharff & Jones was negligent in failing to properly and adequately supervise Mr. Blondeau so as to insure that he did not offer, either for his own account or for the firm, marginal securities of the type sold to plaintiff.
Basically, Scharff & Jones as defendant takes the position that the plaintiff bought the bonds in question from Roy F. Blondeau and knew at the time of the purchases that he was dealing with Roy F. Blondeau as an individual and not with Scharff & Jones. The third party defendant, National Surety Corporation, concurs with this and further urges that the evidence adduced on the trial of the case establishes the loss of plaintiff as one `resulting directly or indirectly from trading, with or without the knowledge of the insured, in the name of the insured or otherwise ' and that, therefore, no coverage is afforded the defendant thus eliminating defendant's claim for expenses and attorney fees incurred in defense of pertinent litigation.
During the course of the two days it took to try this case only three witnesses testified. They were the plaintiff, Leslie T. Hepler; Mr. John Jacob Zollinger, Jr., the president of the defendant firm, Scharff & Jones, Inc.; and, Roy F. Blondeau, the former agent of Scharff & Jones. Mr. Blondeau had previously given his deposition and it was offered in evidence as Exhibit National  1.
The testimony, the deposition of Mr. Blondeau, the pleadings, and all of the offerings including those filed in the record have been carefully reviewed by the Court. In particular, we have reconstructed all of the dealings of the plaintiff with the defendant and Roy F. Blondeau as regards the sale and purchase of securities, whether disputed or not. The various transactions were listed in chronological order (see attached appendix) so that they may be considered in light of and as related to those giving rise to this litigation. Throughout our consideration of the merits of plaintiff's demand we have sought to ascertain the answer to the basic question of whether the plaintiff knew or should have known that he was dealing with Roy E. Blondeau on an individual basis when he purchased the bonds giving rise to his loss. Certainly, that is the pivotal question in this case. An essential element of the plaintiff's case is that he did *673 not know and could not have reasonably been expected to know at the time that he was dealing with Blondeau as an individual but reasonably believed that he was dealing with Scharff & Jones through Blondeau. The plaintiff must prove this fact by a preponderance of the evidence. If he fails to do so, there can be no application of the doctrine of apparent authority.
The Court is constrained to say at this point that it does not believe that the unauthorized acts of Mr. Blondeau in buying and selling bonds for his own account, contrary to his firm's policy, and in violation of law, are acts chargeable to Scharff & Jones on the premises that it was negligent in failing to properly and adequately supervise him. No reasonable amount of supervision or training could or would have prevented Mr. Blondeau from offering the marginal securities to the plaintiff. An employer has the right to assume that his employee is honest and will obey regulations imposed. Strength of character cannot be supplied by the employer and, of course, the Court can do nothing but accept the frailties of human nature. The management of Scharff & Jones was some eighty miles distance from Mr. Blondeau. Necessarily, most of the contact had to be by correspondence and telephone. Conceding that Mr. Blondeau may not have initially received adequate training and that there was never active supervision, the fact remains that Mr. Blondeau had been employed for some eight years before he commenced dealing for his own account during which time he gained considerable experience in selling securities to the public. He had been employed over thirteen years when his unauthorized trading was called to the attention of his employer by the plaintiff whereupon he was immediately dismissed. We do not believe, under the circumstances, that Scharff & Jones was negligent in not adequately supervising Mr. Blondeau but assuming it to be the case, we hold that such negligence was not the cause of the loss to the plaintiff.
The transactions giving rise to this litigation are listed on Exhibit P-14 (filed in the record) and are, along with other transactions, listed on Exhibit D-3.
Specifically, on October 1, 1961, the plaintiff purchased from Roy F. Blondeau five revenue bonds issued by Southeast Hammond Water Company. See Exhibits P-15, P-16, P-17, P-18 and P-19. The evidence establishes that payment of $4.975.00 for the bonds was accomplished by the plaintiff issuing his check payable to Roy F. Blondeau. The check was deposited in Mr. Blondeau's personal checking account. An accounting of the purchase was rendered to plaintiff by Mr. Blondeau on the latter's personal stationery. On January 15, 1962, the plaintiff purchased from Mr. Blondeau one (1) revenue bond issued by Southeast Hammond Water Company (see Exhibit P-25). Payment of $1,000.00 for the bond and confirmation of the purchase was handled in the same manner. On May 14, 1962, the plaintiff purchased five more of the Southeast Hammond Water Company bonds from Mr. Blondeau (Exhibits P-20, P-21, P-22, P-23 and P-24) with payment of $5,356.50 and confirmation of purchase again involving a check payable to Roy F. Blondeau, deposited in his personal checking account, and the use of Blondeau's personal stationery. On October 15, 1962, plaintiff purchased seven revenue bonds issued by Dade County Water Authority (Exhibits P-26, P-27, P-28, P-29, P-30, P-31 and P-32). Payment of $7,532.70 was by check payable to Blondeau and deposited in Blondeau's personal account. Confirmation of the transaction was on Blondeau's personal stationery. On December 3, 1962, plaintiff purchased from Mr. Blondeau the last of the revenue bonds made the subject of this litigation. Exhibits P-33, P-34, P-35, P-36 and P-37 represent five bonds issued by Dade County Water Authority. Payment of $5,465.50 and the accounting was handled as before, i. e., check of plaintiff payable to Mr. Blondeau, deposited in Mr. Blondeau's *674 personal account, and the use of Blondeau's personal letterhead.
In summary, the twenty-three bonds in question were bought by the plaintiff on five different occasions beginning October 1, 1961 and ending December 3, 1962. A period of from approximately six weeks to five months transpired between the various purchases.
A study of the chronological listing worked up by the Court reveals some interesting facts. On January 18, 1961, some eight months before the plaintiff purchased any of the bonds in question from Mr. Blondeau, he purchased a West Baton Rouge Parish security from Mr. Blondeau, individually, and the evidence is to the effect that this purchase was accomplished with payment and confirmation of purchase being devoid of any tangible connection with the firm of Scharff & Jones, Inc. Payment and confirmation was indicative of a personal transaction between the parties. Prior to this apparently personal first transaction of January 18, 1961, the plaintiff had made twelve separate purchases and three separate sales of securities from Scharff & Jones, Inc. These transactions extended from April, 1958, to February, 1959. The evidence establishes that in those instances where the plaintiff made a purchase his check was payable to Scharff & Jones, Inc. and the account of the transaction came from New Orleans on an invoice form that was unmistakably issued by Scharff & Jones. When the plaintiff sold, he received payment from Scharff & Jones as well as their accounting form. In two instances, September 26, 1958 and December 16, 1958, the plaintiff bought and sold securities on the same day for different amounts. The defendant asserts only the difference involved changed hands and the plaintiff refused to deny that such was the case.
On September 29, 1961, the plaintiff sold $4,975.61 worth of securities to Scharff & Jones. Two days later he made his first purchase of the bonds in question for the sum of $4,975.00. In the first instance, he received full payment from Scharff & Jones along with their accounting. In the second instance he made his check payable to Roy F. Blondeau, it was deposited to Blondeau's personal account (presumably endorsed by Mr. Blondeau) and the accounting was on Blondeau's personal letterhead.
On January 15, 1962, plaintiff made the second purchase of the bonds involved in this litigation. He gave Blondeau his personal check for $1,000.00, etc. Four days later, on January 19, 1962, the plaintiff both bought and sold securities dealing as always with Mr. Blondeau but the transactions obviously being ones for the account of Scharff & Jones, Inc. Plaintiff's check for the purchase was payable to Scharff & Jones, their check was received for the securities sold and, in both instances, confirmations or accountings were on the forms obviously issued by Scharff & Jones out of their New Orleans office.
The same point can be made with reference to the third and fourth purchases of the bonds in question. Within three or four days time the plaintiff was, on the one hand, dealing with Roy F. Blondeau in one manner and with Scharff & Jones, through Roy F. Blondeau, in an entirely different manner as regards payment and accounting. Compare the transaction of May 11, 1962, with that of May 14, 1962; and, the transactions of October 11, 1962 with that of October 15, 1962.
The fifth and last purchase of litigated securities on December 3, 1962, was followed by five different purchases of securities issued by Estero Municipal Improvement District, Giles County, and West Baton Rouge Parish. These latter purchases were proven to be from Mr. Blondeau, individually, and handled in the same manner as were the litigated securities. They occurred on December 11, 1962; February 7, 1963, February 14, 1963; July 8, 1963; and, December 31, 1963. The final dealings of the plaintiff, of record, include a sale *675 to Scharff & Jones on December 12, 1962 (one day after a purchase from Blondeau); a purchase from Scharff & Jones on January 26, 1965; and, a sale to Scharff & Jones on March 22, 1966.
The above rather extensive analysis of the transactions between the plaintiff and Roy F. Blondeau as an individual and between the plaintiff and Scharff & Jones through Roy F. Blondeau has been made by the Court so that one can more accurately relate the relevancy of the facts revealed to the basic question of whether the plaintiff knew or should have known at the time he purchased the securities in question that he was dealing on a personal basis with Roy F. Blondeau. Aside from the foregoing analysis, the testimony adduced at the trial and the Blondeau deposition has likewise been related to a determination of the answer to the question. The one important point on which the plaintiff and Mr. Blondeau differs is whether Mr. Blondeau advised the plaintiff that he was selling the securities as an individual. During the course of the trial the plaintiff stated, "I thought I was buying them from Scharff & Jones'. Mr. Blondeau maintained otherwise at the trial and when his deposition was taken, he stated `He knew he was dealing with me individually. * * * I made it plain to him that he was dealing with me as an individual. * * * He paid me in advance because I didn't have any money to cover the cost of receiving the bonds.' (See page 11 of Exhibit National 1.)
With reference to his checks being made payable to Blondeau and not Scharff & Jones the plaintiff testified he thought it amounted only to a bookkeeping transaction involving Blondeau and his firm. His explanation of the fact that he did not get invoices from Scharff & Jones but only statements from Blondeau on the latter's personal letterhead was that he thought it unusual but not out of line. The plaintiff was not sure if he ever paid Blondeau in advance for any securities. He did acknowledge that he loaned money to Blondeau on two occasions but not for the purpose of purchasing bonds.
Mr. Blondeau's explanation of why he told the plaintiff that the transactions were on a personal basis was that he did not want the plaintiff to get suspicious and contact his employer when the regular procedures as regards payment and invoices were not followed thus causing him to lose his job. Mr. Blondeau gives as the reason for the plaintiff selling securities and buying those which defaulted the plaintiff's desire to acquire a higher yield. (See also Exhibit D-34).
We conclude that a clear preponderance of the evidence is to the effect that while the plaintiff may not have known that the securities he was purchasing from Mr. Blondeau were so-called marginal securities, he had every reason to know as early as January 18, 1961 (over eight months before the purchase of any bonds in litigation) that he was dealing with Roy F. Blondeau on a personal basis. After the rather extensive dealings he had with Scharff & Jones through Mr. Blondeau on one basis of payment and accounting, on January 18, 1961 there was an abrupt departure to an entirely different method of payment and accounting. When his cancelled check was returned, a simple examination of it would have revealed that it went into the personal account of Mr. Blondeau and was not negotiated to or by Scharff & Jones, Inc. Those subsequent transactions with Mr. Blondeau involving the securities giving rise to this litigation were executed, in a business sense, almost simultaneously with other transactions between the plaintiff and Scharff & Jones. We refuse to believe that any reasonably prudent business man would not have realized he was doing business with two separate and distinct entities. We do believe that Scharff & Jones led the plaintiff to believe that investment in municipal bonds were desirable and safe; that he could rely on their knowledge and advice; that they offered only those securities which had been investigated and were *676 secured; and, that their agent in Baton Rouge, Roy F. Blondeau, was reliable, thoroughly trained and was, for all intents and purposes, Scharff & Jones in Baton Rouge. However, these established facts are of no consequence once it has been established that the plaintiff knowingly dealt with Mr. Blondeau on a personal basis. He may have felt that he could rely upon Mr. Blondeau to steer him straight on investments because of the latter's background with Scharff & Jones but this would not obligate Scharff & Jones for plaintiff's loss resulting from personal dealings with Blondeau.
The case of First National Bank of Lafayette v. Francis I. duPont & Company [La.App.], 203 So.2d 397, Fourth Circuit (1967), cannot be used as authority to sustain a judgment for the plaintiff in this case. We have no quarrel with the principles of law set forth in that decision but the factual situation there was different in that the loss was sustained by virtue of reliance upon information apparently furnished by the brokerage firm itself. Reliance was not upon the actions or representations of an agent or employee of the broker who was dealing in a disclosed personal or individual capacity or who was dealing under circumstances which would otherwise lead a reasonably prudent man to know the matter was on a personal basis. In the First National Bank of Lafayette case, the representations with regard to the bond were contained in a recent letter written on the letterhead of the broker and signed by an `account executive'. The bank prudently sought to verify the facts stated in the letter by telephoning the New Orleans office of the broker and was told by the `account executive' who had signed the letter that the information contained therein was true and correct. The Court held that based upon the facts alleged in plaintiff's petition to the effect the information given was incorrect due to negligence and lack of care on the part of the brokerage house, a cause of action ex delicto existed against the brokerage house under the doctrine of respondeat superior. In the instant case if the plaintiff had bought the bonds in question from Scharff & Jones, we would give him a judgment for his loss and use the aforesaid case as our authority. Such, however, is not a fact.
While the language contained in Exhibits P-39 and D-2 (letters from plaintiff to Scharff & Jones) may be subject to different interpretation, in the light of other established facts it appears to corroborate our finding that the plaintiff knew he was purchasing the bonds in question from Roy F. Blondeau and not from the defendant, Scharff & Jones. The plaintiff wrote these letters to the defendant after the subject bonds had defaulted and referred to the bonds as having been `sold me by Blondeau'; as ones `he unloaded on me'; and, as ones `all of which were purchased from Roy Blondeau'. At about the same time Blondeau wrote the defendant, `Hepler wanted more yeld than anything we had to offer  I sold him these bonds.' (Exhibit D-34).
Lastly, we do not believe that the plaintiff possessed the knowledge and experience of one who deals in securities as a business but, by the same token, we do not believe that he was a `babe in the woods'. He did understand the general nature of such investments and some of the factors that are to be considered before buying. He admitted that he was familiar with the term `the higher the yield, the greater the risk'. One insight into the plaintiff's orientation is found in his testimony with regard to buying some railroad stock from E. F. Hutton & Company. He mentioned as a reason for buying the stock certain federal legislation that would give railroads an advantage. Accordingly, he felt that it would be a good time to buy railroad stock.
Having found that the plaintiff either knew or should have known that he was dealing with Roy F. Blondeau on a personal basis and not with the defendant, Scharff & Jones, Inc., there is no need to consider the stipulation of counsel relative *677 to the present value of the bonds in question as same bears upon the actual loss of plaintiff. Judgment will be rendered on the merits of the main demand dismissing same at plaintiff's costs. To complete the record, the exception of no cause of action previously referred to the merits will be overruled. Roy F. Blondeau was not made a party defendant in this suit. The Court cannot, therefore, consider any liability on his part and has not done so.

* * * * * *
We now turn our attention to a consideration of the third party demand of Scharff & Jones against National Surety Corporation as regards the claim (amount pretermitted) for expenses and attorney fees incurred in defense of this and other pertinent litigation.
The Brokers Blanket Bond is filed in the record and identified as Exhibit Scharff & Jones  1. The pertinent part of that provision dealing with Court cost and attorneys' fees can be found at the top of the second page and is as follows:
`The underwriter will indemnify the Insured against court costs and reasonable attorneys' fees incurred and paid by the Insured in defending any suit or legal proceeding brought against the Insured to enforce the Insured's liability or alleged liability on account of loss, claim or damage which, if established against the Insured, would constitute a valid and collectible loss sustained by the Insured under the terms of this bond.' (Emphasis supplied)
We have emphasized part of the above language to stress the fact that before any court costs or attorney fees are due Scharff & Jones for defending the action brought by the plaintiff, Leslie T. Hepler, the action had to be one to enforce liability on account of a loss which, if established against Scharff & Jones, would constitute a collectible loss sustained by the latter under the terms of the bond. Hence, we must ask the question, what kind of a loss did Mr. Hepler sustain? Had he prevailed, was his loss one which was caused by any set of facts or circumstances for which the bond afforded Scharff & Jones coverage?
Losses covered by the bond include:
`FIDELITY
"(a) Any loss through any dishonest, fraudulent or criminal act of any of the employees, committed anywhere and whether committed alone or in collusion with others, including loss of property through any such act of any of the employees.'
Reliance is placed by Scharff & Jones upon the above provision. Quoting from their brief:
`There is no question that Roy Blondeau was not a licensed broker of securities, and therefore was not legally licensed to buy and sell bonds for his account. Therefore the sale of bonds in this fashion was a dishonest act under the Statutes of Louisiana (See L.S.R.S. 51:701, 706 and 716 * * *). If Scharff & Jones is cast to (sic) judgment in this litigation, it can only be as a result of the dishonest act of Roy Blondeau in selling these securities to plaintiff in violation of the above statutes, and therefore this matter is brought clearly within the coverage afforded by the bond.'
Under that part of the bond setting forth losses which are not covered, we find subpart (g):
`Any loss resulting directly or indirectly from trading, with or without the knowledge of the insured, in the name of the insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the insured on any customer's account, actual or fictitious, except when covered under insuring clause (A), (D) or (E).'

(Emphasis supplied.)
Hence, from the above it appears that a loss resulting directly or indirectly from `trading' is not covered except under the *678 first quoted Insuring Clause (A) dealing with the fidelity of an employee. If we were to stop here, we might well conclude that Mr. Hepler's loss was caused by the dishonest or criminal act of Roy Blondeau and, therefore, even though he did not prevail against Scharff & Jones, it was the type of loss which `if established against the insured, would constitute a valid and collectible loss sustained by the insured under the terms of the bond', i. e., one obligating National Surety Corporation for court costs and attorneys' fees. However, a Rider attached to and forming part of the Blanket Bond had the stated effect of amending the bond. The rider completely deleted sub-section (g), as written, and substituted in lieu thereof the following language dealing with what we shall term a `trading loss':
`(g) Any loss resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise, whether or not represented by any indebtedness or balance shown to be due the Insured on any customer's account, actual or fictitious, and notwithstanding any act or omission on the part of any employee in connection with any account relating to such trading, indebtedness, or balance. This sub-section shall not apply to Insuring Clause (D) or (E) if coverage is carried thereunder.'

(Emphasis supplied).
`2. If this rider becomes effective after noon of the date of the attached bond, there shall be no liability under Insuring Clause (A) on account of losses resulting directly or indirectly from trading and sustained but not discovered before noon of the date this rider becomes effective.'
By comparing sub-section (g) as originally written into the bond and as stated in the Rider one can readily see that the language was tracked to a point and then the entire import was changed to pointedly exclude from coverage so-called `trading losses' whether same were caused by dishonest, fraudulent or criminal acts of an employee or not. Whereas before, sub-section (g) referred back to Insuring Clause (A) dealing with the fidelity of employees it now pointedly omits any reference to Insuring Clause (A) except as it was necessary to give retroactive effect to the Rider when it is not originally attached to the bond. Compare `except when covered under Insuring Clause (A), (D) or (E)' with, `This sub-section shall not apply to Insuring Clause (D) or (E) if coverage is carried thereunder.' We do not deem it necessary to dwell further on the point. If the loss of Mr. Hepler was one `resulting directly or indirectly from trading, with or without the knowledge of the Insured, in the name of the Insured or otherwise * * * and not withstanding any act or omission on the part of any employee in connection with any account relating to such trading', there was no coverage afforded Scharff & Jones and no claim can be asserted by them for court costs and attorneys' fees.
We conclude that the loss sustained by Mr. Hepler was indeed such a loss. The argument that Roy Blondeau performed a dishonest act in that he violated the law by buying and selling bonds is, conceding same to be true, not a valid one that can be determative of the nature of the loss. And, conceding the position of plaintiff that Blondeau withheld vital information concerning the bonds which, had it been disclosed, would have negated any purchase, such likewise would not be determinative of the nature or cause of the loss. The fact remains that the plaintiff bought revenue bonds for one price and a few years later the issuing authorities defaulted thereby reducing their value and resulting in the plaintiff suffering a loss for the difference. In the face of the trial stipulation entered into by counsel that one group of bonds is worth ten cents on the dollar and the other group is worth sixty cents on the dollar, one cannot correctly contend that they were and are worthless for investment purposes. A drastic loss to be sure, but not worthless.
*679 In the case of Sade v. National Surety Corporation [D.C.], 203 Fed.Supp. 680 (1962), affirmed in [114 U.S.App.D.C. 281] 214 [314] Fed.2d 286 (1963), the court, in interpreting a Brokers Blanket Bond containing identical languate to that with which we are concerned, reasoned as follows:
`The Court recognizes the existence of a technical distinction between a trader and a broker. However, it interprets the word "trading" as used in the National policy' * * * (as having) * * * `the same meaning it has in any mercantile business, namely, the buying and selling of commodities  in the instant case, the buying and selling of securities on a customer's account.'

(Emphasis supplied)
The purchase of the bonds in question by Blondeau and his sale of them to the plaintiff certainly constituted the buying and selling of securities on a customer's account. Since the exclusionary provision of the rider attached to the Broker's Bond does amend, supercede and override the initial provision therein dealing with covered losses resulting from infidelity of employees, it is immaterial whether or not Blondeau acted dishonestly or criminally. The very least that can be said is that the loss was one resulting indirectly from trading and, under the exclusionary language, that is sufficient to deny liability for the loss and hence for indemnification of court costs and attorneys' fees.
One might argue that since the acts of Blondeau in buying and selling the revenue bonds in question were unauthorized by his employer and since he was dealing in marginal securities without disclosing their true nature to the plaintiff that, even if the plaintiff knew or should have known he was dealing on a personal basis, aside from such acts being dishonest, fraudulent and criminal they actually caused the loss and control the nature thereof. In effect, trading had nothing to do with the loss and the exclusion does not apply thereby leaving the fidelity clause applicable. We cannot agree. In the case of Roth v. Maryland Casualty Company, 209 Fed.2d 371, U.S.Ct. of Appeals, Third Circuit (1954) the court held that where the office manager of a security broker without the authority or knowledge of the broker, bought and sold securities in the broker's trade name through an account which was to be used for the sole purpose of filling customers' orders, thus using the account as a trading account, and secreting capital gains profits, such acts constituted `trading' within indemnity bond covering losses from employee's dishonest acts except losses resulting from trading. The exclusionary language interpreted by the court in the Roth case is again identical to that before this Court. There is no doubt but what the acts of the employee in the Roth case were unauthorized and dishonest. In speaking of the employee's acts, the court said:
`If what Fletcher did cannot be characterized as trading it is difficult to conceive what that term embraces. Appellant's reasoning of this phase of the case is that because Fletcher was not authorized to enter into those transactions he simply misappropriated Roth's funds and was not trading at all. In other words, appellant seeks to equate "trading" with unauthorized trading. We are not persuaded that the term should be so restricted.'
We think the reasoning of the court in the Roth case is sound. The analogy between that case and the one before this Court for decision is clear. We likewise reject the premise that there can be no trading unless it is authorized, legally executed and honestly accomplished."
We agree with the reasons assigned by the Lower Court and find no error in its decision.
For the reasons hereinabove assigned, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioner.
Affirmed.